42-08/PJG/PLS
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Peter J. Gutowski (PG 2200)
Pamela L. Schultz (PS 8675)

FEB 0 8 2008
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE SAND

08 CV 1319

08 CV

-----------------------------------------------------x
EMPROS LINES SHIPPING CO. SP. S.A.,

                Plaintiff,

    -against-

TRICOAL (PTY) LTD.,

                Defendant.
-----------------------------------------------------x

**VERIFIED COMPLAINT**

Plaintiff, EMPROS LINES SHIPPING CO. SP. S.A. ("EMPROS"), for its Verified

Complaint against Defendant TRICOAL (PTY) LTD. ("TRICOAL"), alleges upon information

and belief as follows:

1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract

of charter party. This case also falls under this Court's admiralty and maritime jurisdiction

pursuant to 28 U.S.C. §1333 and the Court's federal question jurisdiction pursuant to 28 U.S.C.

§1331. Federal jurisdiction also exists because the action arises under the New York Convention

on the Recognition and Enforcement of Foreign Arbitral Awards at 9 U.S.C. §201 *et seq.* and/or

the Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

2.      At all times material hereto, Plaintiff EMPROS was and still is a foreign business entity duly organized and existing under the laws of Monrovia, Liberia with a branch office with an address at Empros Lines Building, 2, Parnassou Street & Kifissias Avenue, Amaroussion151 24, Greece.

3.      At all times relevant hereto, Defendant TRICOAL was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at P.O. Box 1706, Glenvista 2058, Johannesburg, South Africa.

4.      On or about December 4, 2007, Plaintiff EMPROS, in the capacity as disponent owner of the M/V SIDER UNITY, entered into a maritime contract of charter party with Defendant TRICOAL, as charterer, for the carriage of cargo of petcoke from Texas to Lagos or Apapa at the charterer's option.  A copy of the charter party and charter party recap is annexed as **Exhibit A**.

5.      Pursuant to the terms of the charter party, the vessel was duly presented at the agreed load port and tendered a Notice of Readiness to TRICOAL confirming the readiness to load.

6.      TRICOAL declined to accept the vessel, and did not tender a cargo, alleging that certain purported class issues precluded it from accepting the vessel.

7.      The vessel was, however, at times material hereto within class and thus the tender for performance under the charter was proper and TRICOAL"s refusal to load the vessel constituted a repudiation of the charter.

8.      EMPROS subsequently accepted TRICOAL's repudiation of the contract, and immediately set about to mitigate damages by chartering the vessel for another voyage to another party.

9.      Plaintiff EMPROS was successful in finding substitute employment for the vessel and entered into a charter party with another charterer, but at a lower freight rate than the charter party with TRICOAL.

10.     The repudiation, as aforesaid, caused EMPROS damages which, as nearly as can be computed, total $921,880 representing the difference between the sum that would have been earned in the way of profit had the original contract been performed and the net result of the mitigation voyage. A copy of the estimated voyage calculations for the TRICOAL voyage and the mitigation voyage are attached as **Exhibit B.**

11.     There also remains due and owing demurrage under the terms of the charter party in the amount of $135,586.17, representing the time waiting at the load port prior to the repudiation. A copy of the invoice reflecting the demurrage calculation is attached as **Exhibit C.**

12.     Despite due demand TRICOAL has refused and/or otherwise failed to pay the amounts due and outstanding.

13.     The charter party provides for the application of English law and all disputes between the parties are to be resolved by the arbitration in London, and EMPROS specifically reserves its right to proceed in arbitration.

14.     This action is brought to obtain jurisdiction over TRICOAL and to obtain security in favor of Plaintiff EMPROS in respect to its claims against TRICOAL and in aid of London proceedings.

15.     This action is further brought to obtain security for any additional sums to cover Plaintiff's anticipated attorney fees and costs in the London arbitration and interest, all of which are recoverable as part of Plaintiff's claim under English law.

16.    Under English law, including but not limited to Section 63 of the English Arbitration Act of 1996, costs including attorney fees, arbitrators' fees, disbursements and interest are recoverable as an element of Plaintiff's claim.

17.    Plaintiff estimates, as nearly as can be computed, that the legal expenses and arbitral costs of prosecuting the claim in London will be $350,000 and interest on its damages are estimated to be $200,331.14 (calculated at the rate of 7% for a period of two and one half years, the estimated time for completion of the proceedings in London).

### Request for Rule B Relief

18.    Upon information and belief, and after investigation, Defendant cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant (collectively hereinafter, "ASSETS"), including but not limited to ASSETS at, moving through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein.

19.    The total amount to be attached pursuant to the calculations set forth above is $1,607,797.31.

WHEREFORE, Plaintiff EMPROS LINES SHIPPING CO. SP. S.A. prays:

a.    That process in due form of law according to the practice of this Court may issue against Defendant citing it to appear and answer the foregoing;

b.    That if Defendant cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendant up to and including **$1,607,797.31** be restrained and attached, including, but not limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or being transferred from or for the benefit of Defendant (collectively hereinafter, "ASSETS"), including but not limited to such ASSETS as may be held, received, or transferred in its name or as may be held, received or transferred for its benefit, at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

c.    That this Court retain jurisdiction over the matter for any further or supplemental proceedings as may be necessary, including but not limited to the recognition and enforcement of any judgment entered against the Defendant in the London proceedings; and

d.    For such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
February 8, 2008

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff

By: _____
    Peter J. Gutowski (PG 2200)
    Pamela L. Schultz (PS 8675)
    80 Pine Street
    New York, NY 10005
    (212) 425-1900

## ATTORNEY VERIFICATION

State of New York    )
                        ) ss.:
County of New York  )

PETER J. GUTOWSKI, being duly sworn, deposes and says as follows:

1.     I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.     The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by solicitors representing our client.

3.     The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

_____
Peter J. Gutowski

Sworn to before me this
8th day of February 2008.

_____
Notary Public

MELISSA COLFORD
Commissioner of Deeds
City of New York-No. 5-1692
Certificate Filed in New York
Commission Expires 4/1/08

!wTELiX 7.14c ** Message printout ** Printed:21/12/07 11:05:45 by:gk.

!C=IOM 782D9-00 0412 1654 ^REPLY-TO      HELLASCH  P·                          S· gkg
!=================================================================
TELiX MSG: 782D9-00 04/12/07 16:54

!^REPLY-TO:Hellaschart Ltd <hellasch@otenet.gr>
!SUBJECT:RE:LgINT Message {REF:07AFE4000}
!Original msg:C*IIM 781CC-00 0412 1514   HELLASCH {gk 04/12/07 16:49:38}
EMPROS LINES SHIPPING CO. SF. S.A. - GREECE
Tel: +30 (210) 8125500-4 - Fax:+30 (210) 8125580 - Telex: 214706
E-mail: chartering@emproslines.com - Web Site: www.EmprosLines.com

spiro/giorgos

gd day

Tks recap which found in order except to read 'jaco merchant c/p dated 23feb
2007' instead of 'chrtrs previously'

so vsl fixed clean
pls pass corected recap on your 1st convenience

Rgrds

>----- Original Message -----

>From:HellaschartLtd<hellasch@otenet.gr>
>To   :chartering@emproslines.com;
>Sent: Tue, 04 Dec 2007 15:06:06 +0200
>Subject: LgINT Message {REF:07AFE4000}

TELiX MSG: AFE40-00 04/12/07 15:06

FROM: HELLASCHART LTD -TEL: +30210 6207587 -FAX: +30210 6209379

Giorgos/Spiros

Please get Owns to confirm the following recap.

Vessel: M/V SIDER UNITY as described below
Account: Tricoal (Pty) Ltd, Johannesburg
Commodity: abt 15,000mt 10% less, 5% more oopt green delayed petcoke (not
calcined) sf abt 44/46 cuft pmt
Load: lgsb aa Houston
Discharge: lgsb aa Lagos- Tincan Island or Apapa Chopt.
nor wwww by cable/radio/tlx/fax, time start to count 8am / 2pm at bends
dport declared latest on sailing lport
Laycan: 20/27 December 2007 00h01 - 24h00 1/1
Freight: USD 126 pmt FIOST (Spout trimmed only)
Charters Agents Bends
Agents Load Port:      Biehl & Company Inc
                       5200 Hollister
                       Houston, TX. 77040
                       Tel: 713-690-7200 (24 hours)
                       Tel: 713-895-3128 (Direct)
                       Fax: 713-895-3090

Mr Ivan Razo

EXHIBIT

A

Tel: 713-895-3135
Telex: 149183 / E-mail: biehlhou@biehlco.com
Agents Discharge Port:    Samcham

                         Toyin Omisore
samcham@hyperia.com    &lt;mailto:samcham@hyperia.com&gt;

                         +23 41 587 4002 (office)
                         +23 48 02313 8133 (mobile)

Free d/a at dischport
Loadrate: 24 hours pwwd shinc super holidays as per bimco calendar excluded
(Owns confirm superholidays include 25, 26 December & 01 January)
Discharge rate: 1500mt pwwd of 24 cons hrs satshexun
Demurrage: USD 27,000 pdpr / hdbends
Time from 17h00 the day before a holiday until 08h00 the day after a holiday
not to count.
Commission: 3.75 pct ttl here + 1,25 pct to Hellaschart ltd
Owns to confirm vessel's gear capable of discharging into hopper; height of
which is 22' above the quayside, height of hoppers is 6.5m while water level
at high tide is 1.3m and 1.57m at low tide
Taxes/dues on cgo/frt chrtrs acc bends
Appendix B: Please find attached MSDS sheet for applicable coke. As it is
chtrs understanding an Appendix B certificate is not needed, however, it is
the sole responsibility of the owners to satisfy themselves in all respects
to safely and efficiently carry the cargo.

U.S. Customs 24 Hours Rule Clause For Voyage Charter Parties
(a) If loading cargo destined for the US or passing through US ports in
transit, the Charterers shall:
(i) Provide all the necessary information, upon request of the Owners, to
the Owners and / or their agents to enable them to submit a timely and
accurate cargo declaration directly to the US customs; or
(ii) If permitted by US Customs Regulations (19 CFR 4.7) or any subsequent
amendments thereto, submit a cargo declaration directly to the US Customs
and provide the Owners with a copy thereof.
In all circumstances, the cargo declaration must be submitted to the US
Customs latest 24 hours in advance of loading.
(b) The Charterers assume liability for and shall indemnify, defend and hold
harmless the Owners against any loss and/or damage whatsoever (including
consequential loss and/or damage) and any expenses, fines, penalties and all
other claims of whatsoever nature, including but not limited to legal costs,
arising from Charterers' failure to comply with provisions of sub-clause
(a).
(c) If the Vessel is detained, attached, seized or arrested as a result of
the Charterers' failure to comply with the provisions of sub-clause (a), the
Charterers shall provide a bond or other security to ensure the prompt
release of the Vessel. All time used or lost until the Vessel is free to
leave any port of call shall count as laytime or, if the Vessel is already
on demurrage, time on demurrage.

U.S. Tax Reform 1986 Clause
Any U.S. Gross Transportation Tax as enacted by the United States Public Law
99-514, (also referred to as The U.S. Tax Reform Act of 1986), including
later changes or amendments, levied on income attributable to transportation
under this Charter Party which begins or ends in the United States, and
which income under the laws of the United States is treated as U.S. source
transportation gross income, shall be reimbursed by the Charterers.

U.S. Customs Advance Notification/AMS Clause for Voyage Charter Parties.

(a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Owners shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:
i) Have in place a SCAC (Standard Carrier Alpha Code);
ii) Have in place an ICB (International Carrier Bond); and
iii) Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs.

(b) The Charterers shall provide all necessary information to the Owners and/or their agents to enable the Owners to submit a timely and accurate cargo declaration.
The Charterers shall assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of this sub-clause. Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, all time used or lost shall count as laytime or, if the Vessel is already on demurrage, time on demurrage.

(c) The Owners shall assume liability for and shall indemnify, defend and hold harmless the Charterers against any loss and/or damage whatsoever (including consequential loss and/or damage) and any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Owners' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, all time used or lost shall not count as laytime or, if the Vessel is already on demurrage, time on demurrage.

(d) The assumption of the role of carrier by the Owners pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.


Otherwise as per Chtrs previously fixed gencon 94 CP with the following amendments:


Clause 5 from line 70 to read: Charterers shall provide free of charge cranemen / winchmen to operate the Vessel's cargo handling gear. Cranemen / winchmen shall be under the Charterers' risk and responsibility and as stevedores to be deemed as their servants but shall always work under the supervision of the Master.


Clause 6(b) to be deleted


Clause 24 to read:     NOTICE OF READINESS. Vessel is giving load readiness 20 December 2007 weather permitting all going well. At both leading and discharge port Owners to give 10/5/4/3/2/1 days notice of vessel's arrival. Notice of readiness to be given to Brokers and Agents. Ntice of Readiness can be tendered whether in port or not, whether in berth or not, whether in free pratique or not, whether customs cleared or not. Notice of Readiness to be tendered basis wwww even by cable/vhf/tlx within normal working hours 0800/1700, Monday to Sunday, superholidays excluded.


clause 26 delete 'sufficient'
          after 'lights' add 'as on board'
Clause 34 to read: Demurrage to be settled / paid within 10 banking days

after presentation of laytime calculation / nor / sof / time sheet all duly
signed by agents, fax copies to be accepted.

Clause 36 to be deleted.

Vessel Description:
M/V SIDER UNITY
17409 MTS DWAT ON 8.80M SSW
MARSHALL ISLS FLAG/BLT 95/CLASS NKK
SID/BC
GR/BL 698954, 12/684760 cbft
4 H/H, 3X25MT CRANES
ITF FITTED/AHL FITTED
LOA 143,34 m / BEAM 22 m
GRT/NRT 10421/5324
PNI SKULD
ADA+WOG

DISPONENT OWNERS: Empros Lines Shipping Co. SP.S.A. Liberia, branch in
Greece

Brgds

>----- Original Message End -----

|
|=== MESSAGE INFORMATION: [size: 9113 bytes] [2] [M]
|=== END
|==================================== System notice  04/12/07 16:54:02
|From:Empros Lines - Chartering <chartering@emproslines.com>
|To..:hellasch@otenet.gr;
|Sent:Tue, 04 Dec 2007 16:54:02 +0200
|Subj:RE:LgINT Message [REF:07AFE4000] [REF:07782D900]
|Smtp:250 2.6.0 <DIASzscE0NpqhNPPzQT00000ac5@dias.empros.local> Queued mail
|**ATTENTION**: Status 'S' means submitted to Internet (with above SMTP id)
|==================================================================

| | |
|---|---|
| 1. Shipbroker<br>**JADICA SHIPPING & TRADING (PTY) LTD**<br>**PO BOX 1097**<br>**NEW GERMANY**<br>**3620**<br>**SOUTH AFRICA** | RECOMMENDED<br>THE BALTIC AND INTERNATIONAL MARITIME COUNCIL<br>UNIFORM GENERAL CHARTER (AS REVISED 1922, 1976 and 1994)<br>(To be used for trades for which no specially approved form is in force)<br>CODE NAME: "GENCON"　　　　　　　　　　　Part I |
| | 2. Place and Date<br>**23 FEBRUARY 2007** |
| 3. Owners/Place of business (Cl. 1)<br>**JARRIT SHIPPING CORP.**<br>**MARSHALL ISLANDS** | 4. Charterers/Place of business (Cl. 1)<br>**TRICOAL**<br>**SOUTH AFRICA** |
| 5. Vessel's name (Cl. 1)<br>**JACO MERCHANT** | 6. GT/NT (Cl. 1)<br>**8.183 / 4.408** |
| 7. DWT all told on summer load line in metric tons (abt.) (Cl. 1)<br>**10.700MT** | 8. Present position (Cl. 1)<br>**TRADING** |
| 9. Expected ready to load (abt.) (Cl. 1)<br>**16 MARCH 2007** | |
| 10. Loading port or place (Cl. 1)<br>**1 GOOD SAFE BERTH, PORT ALWAYS AFLOAT, TECO BULK TERMINAL, DAVANT** | 11. Discharging port or place (Cl. 1)<br>**1 GOOD SAFE BERTH, PORT ALWAYS AFLOAT, TICAN OR APAPA, LAGOS** |
| 12. Cargo (also state quantity and margin in Owners' option, if agreed; if full and complete cargo not agreed state "part cargo") (Cl. 1)<br>**ABT 10,000MT COAL 5% MORE OR LESS IN OWNERS OPTION. GREEN DELAYED PETCOKE (NOT CALCINED) STOWAGE FACTOR 44/46 CUBIT FEET PER METRIC TON** | |
| 13. Freight rate (also state whether freight prepaid or payable on delivery) (Cl. 4)<br>**USD 68.00 PER METRIC TON FIOT (FREE D/A IN LAGOS)**<br>　**Freight deemed earned non returnable ship and or cargo lost or not lost** | 14. Freight payment (state currency and method of payment; also beneficiary and<br>bank account) (Cl. 4)<br>**SEE CLAUSE 32** |
| 15. State if vessel's cargo handling gear shall not be used (Cl. 5) | 16. Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b). If<br>total laytime for load. and disch., fill in c) only) (Cl. 6) |
| 17. Shippers/Place of business (Cl. 6)<br>**TRICOAL (PTY) LTD (C/O JADICA, DURBAN)** | (a) Laytime for loading<br>**SHINC** |
| 18. Agents (loading) (Cl. 6)<br>**REVELLE** | (b) Laytime for discharging<br>**SATSHEXUU** |
| 19. Agents (discharging)( Cl. 6)<br>**SAMCHAM** | (c) Total laytime for loading and discharging |
| 20. Demurrage rate and manner payable (loading and discharging) (Cl. 7)<br>**USD 9750 PER DAY PRO RATA (HALF DESPATCH WORKING TIME SAVED BOTH ENDS)** | 21. Cancelling date (Cl. 9)<br>**21 MARCH 2007** |
| | 22. General Average to be adjusted at (Cl. 12)<br>**LONDON** |
| 23. Freight Tax (state if for the Owners' account (Cl. 13 (c)) | 24. Brokerage commission and to whom payable (Cl. 15)<br>**3.75% TO JADICA SHIPPING & TRADING, SOUTH AFRICA +**<br>**1.25% TO HOWE ROBINSON SHIPBROKERS, LONDON** |
| 25. Law and Arbitration (state 19 (a), 19 (b) or 19 (c) of Cl. 19; if 19 (c) agreed<br>also state Place of Arbitration) (if not filled in 19 (a) shall apply) (Cl. 19)<br>**SEE CLAUSE 29** | 26. Additional clauses covering special provisions, if agreed<br>**CLAUSES 20 TO 36 DEEMED TO BE INCLUDED HEREIN** |
| (a) State maximum amount for small claims/shortened arbitration (Cl. 19) | |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter Party which shall include Part I as well as Part II. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

| | |
|---|---|
| Signature (Owners) | Signature (Charterers) |

*Printed by BIMCO's idea*

*Copyright, published by The Baltic and International Maritime Council (BIMCO), Copenhagen*

This document is a computer generated GENCON 1994 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II
"Gencon" Charter (As Revised 1922, 1976 and 1994)

1. It is agreed between the party mentioned in Box 3 as the Owners of the Vessel named in Box 5, of the GT/NT indicated in Box 6 and carrying about the number of metric tons of deadweight capacity all told on summer loadline stated in Box 7, now in position as stated in Box 8 and expected ready to load under this Charter Party about the date indicated in Box 9, and the party mentioned as the Charterers in Box 4 that:
The said Vessel shall, as soon as her prior commitments have been completed, proceed to the loading port(s) or place(s) stated in Box 10 or so near thereto as she may safely get and lie always afloat, and there load a full and complete cargo (if shipment of deck cargo agreed same to be at the Charterers' risk and responsibility) as stated in Box 12, which the Charterers bind themselves to ship, and being so loaded the Vessel shall proceed to the discharging port(s) or place(s) stated in Box 11 as ordered on signing Bills of Lading, or so near thereto as she may safely get and lie always afloat, and there deliver the cargo.

2. Owners' Responsibility Clause
The Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by personal want of due diligence on the part of the Owners or their Manager to make the Vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied, or by the personal act or default of the Owners or their Manager.
And the Owners are not responsible for loss, damage or delay arising from any other cause whatsoever, even from the neglect or default of the Master or crew or some other person employed by the Owners on board or ashore for whose acts they would, but for this Clause, be responsible, or from unseaworthiness of the Vessel on loading or commencement of the voyage or at any time whatsoever.

3. Deviation Clause
The Vessel has liberty to call at any port or ports in any order, for any purpose, to sail without pilots, to tow and/or assist Vessels in all situations, and also to deviate for the purpose of saving life and/or property.

4. Payment of Freight
(a) The freight at the rate stated in Box 13 shall be paid in cash calculated on the intaken quantity of cargo.
~~(b) Prepaid. If according to Box 13 freight is to be paid on shipment, it shall be deemed earned and non returnable, Vessel and/or cargo lost or not lost. Neither the Owners nor their agents shall be required to sign or endorse bills of lading showing freight prepaid unless the freight due to the Owners has actually been paid.~~
~~(c) On delivery. If according to Box 13 freight, or part thereof, is payable at destination it shall not be deemed earned until the cargo is thus delivered. Notwithstanding the provisions under (a), if freight or part thereof is payable on delivery of the cargo the Charterers shall have the option of paying the freight on delivered weight/quantity provided such option is declared before breaking bulk and the weight/quantity can be ascertained by official weighing machine, joint draft survey or tally. Cash for Vessel's ordinary disbursements at the port of loading to be advanced by the Charterers, if required, at highest current rate of exchange, subject to two (2) per cent to cover insurance and other expenses.~~

5. Loading/Discharging
(a) Costs/Risks
The cargo shall be brought into the holds, loaded, stowed and/or trimmed, tallied, lashed and/or secured and taken from the holds and discharged by the Charterers, free of any risk, liability and expense whatsoever to the Owners. The Charterers shall provide and lay all dunnage material as required for the proper stowage and protection of the cargo on board, the Owners allowing the use of all dunnage available on board. The Charterers shall be responsible for and pay the cost of removing their dunnage after discharge of the cargo under this Charter Party and time to count until dunnage has been removed.
(b) Cargo Handling Gear
Unless the Vessel is gearless or unless it has been agreed between the parties that the Vessel's gear shall not be used and stated as such in Box 15, the Owners shall throughout the duration of loading/discharging give free use of the Vessel's cargo handling gear and of sufficient motive power to operate all such cargo handling gear. All such equipment to be in good working order. Unless caused by negligence of the stevedores, time lost by breakdown of the Vessel's cargo handling gear or motive power - pro rata the total number of cranes/winches required at that time for the loading/discharging of cargo under this Charter Party - shall not count as laytime or time on demurrage. On request the Owners shall provide free of charge cranemen/winchmen from the crew to operate the Vessel's cargo handling gear, unless local regulations prohibit this, in which latter event shore labourers shall be for the account of the Charterers. Cranemen/winchmen shall be under the Charterers' risk and responsibility and as stevedores to be deemed as their servants but shall always work under the supervision of the Master.
(c) Stevedore Damage

The Charterers shall be responsible for damage (beyond ordinary wear and tear) to any part of the Vessel caused by Stevedores. Such damage shall be notified as soon as reasonably possible by the Master to the Charterers or their agents and to their Stevedores, failing which the Charterers shall not be held responsible. The Master shall endeavour to obtain the Stevedores' written acknowledgement of liability.
The Charterers are obliged to repair any stevedore damage prior to completion of the voyage, but must repair stevedore damage affecting the Vessel's seaworthiness or class before the Vessel sails from the port where such damage was caused or found. All additional expenses incurred shall be for the account of the Charterers and any time lost shall be for the account of and shall be paid to the Owners by the Charterers at the demurrage rate.

6. Laytime
* (a) Separate laytime for loading and discharging
The cargo shall be loaded within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.
The cargo shall be discharged within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.
* (b) Total laytime for loading and discharging
The cargo shall be loaded and discharged within the number of total running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.
(c) Commencement of laytime (loading and discharging)
Laytime for loading and discharging shall commence at 4314.00 hours, if notice of readiness is given up to and including 12.00 hours, and at 0608.00 hours next working day if notice given during office hours after 12.00 hours. Notice of readiness at loading port to be given to the Shippers named in Box 17 or if not named, to the Charterers or their agents named in Box 18. Notice of readiness at the discharging port to be given to the Receivers or, if not known, to the Charterers or their agents named in Box 19.
If the loading/discharging berth is not available on the Vessel's arrival at or off the port of loading/discharging, the Vessel shall be entitled to give notice of readiness within ordinary office hours on arrival there, whether in free pratique or not, whether customs cleared or not. Laytime or time on demurrage shall then count as if she were in berth and in all respects ready for loading/discharging provided that the Master warrants that she is in fact ready in all respects. Time used in moving from the place of waiting to the loading/discharging berth shall not count as laytime.
If, after inspection, the Vessel is found not to be ready in all respects to load/discharge time lost after the discovery thereof until the Vessel is again ready to load/discharge shall not count as laytime.
Time used before commencement of laytime shall count.
* Indicate alternative (a) or (b) as agreed, in Box 16.

7. Demurrage
Demurrage at the loading and discharging port is payable by the Charterers at the rate stated in Box 20 in the manner stated in Box 20 per day or pro rata for any part of a day. Demurrage shall fall due day by day and shall be payable upon receipt of the Owners' invoice.
In the event the demurrage is not paid in accordance with the above, the Owners shall give the Charterers 96 running hours written notice to rectify the failure. If the demurrage is not paid at the expiration of this time limit and if the vessel is in or at the loading port, the Owners are entitled at any time to terminate the Charter Party and claim damages for any losses caused thereby.

8. Lien Clause
The Owners shall have a lien on the cargo and on all sub-freights payable in respect of the cargo, for freight, deadfreight, demurrage, claims for damages and for all other amounts due under this Charter Party including costs of recovering same.

9. Cancelling Clause
(a) Should the Vessel not be ready to load (whether in berth or not) on the cancelling date indicated in Box 21, the Charterers shall have the option of cancelling this Charter Party.
(b) Should the Owners anticipate that, despite the exercise of due diligence, the Vessel will not be ready to load by the cancelling date, they shall notify the Charterers thereof without delay stating the expected date of the Vessel's readiness to load and asking whether the Charterers will exercise their option of cancelling the Charter Party, or agree to a new cancelling date.
Such option must be declared by the Charterers within 48 running hours after the receipt of the Owners' notice. If the Charterers do not exercise their option of cancelling, then this Charter Party shall be deemed to be amended such that the seventh day after the new readiness date stated in the Owners' notification to the Charterers shall be the new cancelling date.
The provisions of sub-clause (b) of this Clause shall operate only once, and in

This document is a computer generated GENCON 1994 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II
"Gencon" Charter (As Revised 1922, 1976 and 1994)

case of the Vessel's further delay, the Charterers shall have the option of 152
cancelling the Charter Party as per sub-clause (a) of this Clause. 153

**10. Bills of Lading** 154

Bills of Lading shall be presented and signed by the Master as per the 155
"Congenbill" Bill of Lading form, Edition 1994, without prejudice to this Charter 156
Party, or by the Owners' agents provided written authority has been given by 157
Owners to the agents, a copy of which is to be furnished to the Charterers. The 158
Charterers shall indemnify the Owners against all consequences or liabilities 159
that may arise from the signing of bills of lading as presented to the extent that 160
the terms or contents of such bills of lading impose or result in the imposition of 161
more onerous liabilities upon the Owners than those assumed by the Owners 162
under this Charter Party. 163

**11. Both-to-Blame Collision Clause** 164

If the Vessel comes into collision with another vessel as a result of the 165
negligence of the other vessel and any act, neglect or default of the Master, 166
Mariner, Pilot or the servants of the Owners in the navigation or in the 167
management of the Vessel, the owners of the cargo carried hereunder will 168
indemnify the Owners against all loss or liability to the other or non-carrying 169
vessel or her owners in so far as such loss or liability represents loss of, or 170
damage to, or any claim whatsoever of the owners of said cargo, paid or 171
payable by the other or non-carrying vessel or her owners to the owners of said 172
cargo and set-off, recouped or recovered by the other or non-carrying vessel 173
or her owners as part of their claim against the carrying Vessel or the Owners. 174
The foregoing provisions shall also apply where the owners, operators or those 175
in charge of any vessel or vessels or objects other than, or in addition to, the 176
colliding vessels or objects are at fault in respect of a collision or contact. 177

**12. General Average and New Jason Clause** 178

General Average shall be adjusted in London unless otherwise agreed in Box 179
22 according to York-Antwerp Rules 1994 and any subsequent modification 180
thereof. Proprietors of cargo to pay the cargo's share in the general expenses 181
even if same have been necessitated through neglect or default of the Owners' 182
servants (see Clause 2). 183
If General Average is to be adjusted in accordance with the law and practice of 184
the United States of America, the following Clause shall apply: "In the event of 185
accident, danger, damage or disaster before or after the commencement of the 186
voyage, resulting from any cause whatsoever, whether due to negligence or 187
not, for which, or for the consequences of which, the Owners are not 188
responsible, by statute, contract or otherwise, the cargo shippers, consignees 189
or the owners of the cargo shall contribute with the Owners in General Average 190
to the payment of any sacrifices, losses or expenses of a General Average 191
nature that may be made or incurred and shall pay salvage and special charges 192
incurred in respect of the cargo. If a salving vessel is owned or operated by the 193
Owners, salvage shall be paid for as fully as if the said salving vessel or vessels 194
belonged to strangers. Such deposit as the Owners, or their agents, may deem 195
sufficient to cover the estimated contribution of the goods and any salvage and 196
special charges thereon shall, if required, be made by the cargo, shippers, 197
consignees or owners of the goods to the Owners before delivery.". 198

**13. Taxes and Dues Clause** 199

(a) On Vessel -The Owners shall pay all dues, charges and taxes customarily 200
levied on the Vessel, howsoever the amount thereof may be assessed. 201
(b) On cargo -The Charterers shall pay all dues, charges, duties and taxes 202
customarily levied on the cargo, howsoever the amount thereof may be 203
assessed. 204
(c) On freight -Unless otherwise agreed in Box 23, taxes levied on the freight 205
shall be for the Charterers' account. 206

**14. Agency** 207

In every case the Owners shall appoint their own Agent both at the port of 208
loading and the port of discharge. 209

**15. Brokerage** 210

A brokerage commission at the rate stated in Box 24 on the freight, dead-freight 211
and demurrage earned is due to the party mentioned in Box 24. 212
In case of non-execution 1/3 of the brokerage on the estimated amount of 213
freight to be paid by the party responsible for such non-execution to the 214
Brokers as indemnity for the latter's expenses and work. In case of more 215
voyages the amount of indemnity to be agreed. 216

**16. General Strike Clause** 217

(a) If there is a strike or lock-out affecting or preventing the actual loading of the 218
cargo, or any part of it, when the Vessel is ready to proceed from her last port or 219
at any time during the voyage to the port or ports of loading or after her arrival 220
there, the Master or the Owners may ask the Charterers to declare, that they 221
agree to reckon the laydays as if there were no strike or lock-out. Unless the 222
Charterers have given such declaration in writing (by telegram, if necessary) 223
within 24 hours, the Owners shall have the option of cancelling this Charter 224

Party. If part cargo has already been loaded, the Owners must proceed with 225
same, (freight payable on loaded quantity only) having liberty to complete with 226
other cargo on the way for their own account. 227
(b) If there is a strike or lock-out affecting or preventing the actual discharging 228
of the cargo on or after the Vessel's arrival at or off port of discharge and same 229
has not been settled within 48 hours, the Charterers shall have the option of 230
keeping the Vessel waiting until such strike or lock-out is at an end against 231
paying half demurrage after expiration of the time provided for discharging 232
until the strike or lock-out terminates and thereafter full demurrage shall be 233
payable until the completion of discharging, or of ordering the Vessel to a safe 234
port where she can safely discharge without risk of being detained by strike or 235
lock-out. Such orders to be given within 48 hours after the Master or the 236
Owners have given notice to the Charterers of the strike or lock-out affecting 237
the discharge. On delivery of the cargo at such port, all conditions of this 238
Charter Party and of the Bill of Lading shall apply and the Vessel shall receive 239
the same freight as if she had discharged at the original port of destination, 240
except that if the distance to the substituted port exceeds 100 nautical miles, 241
the freight on the cargo delivered at the substituted port to be increased in 242
proportion. 243
(c) Except for the obligations described above, neither the Charterers nor the 244
Owners shall be responsible for the consequences of any strikes or lock-outs 245
preventing or affecting the actual loading or discharging of the cargo. 246

**17. War Risks ("Voywar 1993")** 247

(1) For the purpose of this Clause, the words: 248
(a) The "Owners" shall include the shipowners, bareboat charterers, 249
disponent owners, managers or other operators who are charged with the 250
management of the Vessel, and the Master; and 251
(b) "War Risks" shall include any war (whether actual or threatened), act of 252
war, civil war, hostilities, revolution, rebellion, civil commotion, warlike 253
operations, the laying of mines (whether actual or reported), acts of piracy, 254
acts of terrorists, acts of hostility or malicious damage, blockades 255
(whether imposed against all Vessels or imposed selectively against 256
Vessels of certain flags or ownership, or against certain cargoes or crews 257
or otherwise howsoever), by any person, body, terrorist or political group, 258
or the Government of any state whatsoever, which, in the reasonable 259
judgement of the Master and/or the Owners, may be dangerous or are 260
likely to be or to become dangerous to the Vessel, her cargo, crew or other 261
persons on board the Vessel. 262
(2) If at any time before the Vessel commences loading, it appears that, in the 263
reasonable judgement of the Master and/or the Owners, performance of 264
the Contract of Carriage, or any part of it, may expose, or is likely to expose, 265
the Vessel, her cargo, crew or other persons on board the Vessel to War 266
Risks, the Owners may give notice to the Charterers cancelling this 267
Contract of Carriage, or may refuse to perform such part of it as may 268
expose, or may be likely to expose, the Vessel, her cargo, crew or other 269
persons on board the Vessel to War Risks; provided always that if this 270
Contract of Carriage provides that loading or discharging is to take place 271
within a range of ports, and at the port or ports nominated by the Charterers 272
the Vessel, her cargo, crew, or other persons onboard the Vessel may be 273
exposed, or may be likely to be exposed, to War Risks, the Owners shall 274
first require the Charterers to nominate any other safe port which lies 275
within the range for loading or discharging, and may only cancel this 276
Contract of Carriage if the Charterers shall not have nominated such safe 277
port or ports within 48 hours of receipt of notice of such nomination. 278
(3) The Owners shall not be required to continue to load cargo for any voyage, 279
or to sign Bills of Lading for any port or place, or to proceed or continue on 280
any voyage, or on any part thereof, or to proceed through any canal or 281
waterway, or to proceed to or remain at any port or place whatsoever, 282
where it appears, either after the loading of the cargo commences, or at 283
any stage of the voyage thereafter before the discharge of the cargo is 284
completed, that, in the reasonable judgement of the Master and/or the 285
Owners, the Vessel, her cargo (or any part thereof), crew or other persons 286
on board the Vessel (or any one or more of them) may be, or are likely to be, 287
exposed to War Risks. If it should so appear, the Owners may by notice 288
request the Charterers to nominate a safe port for the discharge of the 289
cargo or any part thereof, and if within 48 hours of the receipt of such 290
notice, the Charterers shall not have nominated such a port, the Owners 291
may discharge the cargo at any safe port of their choice (including the port 292
of loading) in complete fulfilment of the Contract of Carriage. The Owners 293
shall be entitled to recover from the Charterers the extra expenses of such 294
discharge and, if the discharge takes place at any port other than the 295
loading port, to receive the full freight as though the cargo had been 296
carried to the discharging port and if the extra distance exceeds 100 miles, 297
to additional freight which shall be the same percentage of the freight 298
contracted for as the percentage the extra distance represents to 299
the distance of the normal and customary route, the Owners having a lien 300
on the cargo for such expenses and freight. 301
(4) If at any stage of the voyage after the loading of the cargo commences, it 302

This document is a computer generated GENCON 1994 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II
"Gencon" Charter (As Revised 1922, 1976 and 1994)

appears that, in the reasonable judgement of the Master and/or the 303
Owners, the Vessel, her cargo, crew or other persons on board the Vessel 304
may be, or are likely to be, exposed to War Risks on any part of the route 305
(including any canal or waterway) which is normally and customarily used 306
in a voyage of the nature contracted for, and there is another longer route 307
to the discharging port, the Owners shall give notice to the Charterers that 308
this route will be taken. In this event the Owners shall be entitled, if the total 309
extra distance exceeds 100 miles, to additional freight which shall be the 310
same percentage of the freight contracted for as the percentage which the 311
extra distance represents to the distance of the normal and customary 312
route. 313

(5) The Vessel shall have liberty:- 314
(a) to comply with all orders, directions, recommendations or advice as to 315
departure, arrival, routes, sailing in convoy, ports of call, stoppages, 316
destinations, discharge of cargo, delivery or in any way whatsoever which 317
are given by the Government of the Nation under whose flag the Vessel 318
sails, or other Government to whose laws the Owners are subject, or any 319
other Government which so requires, or any body or group acting with the 320
power to compel compliance with their orders or directions; 321
(b) to comply with the orders, directions or recommendations of any war 322
risks underwriters who have the authority to give the same under the terms 323
of the war risks insurance; 324
(c) to comply with the terms of any resolution of the Security Council of the 325
United Nations, any directives of the European Community, the effective 326
orders of any other Supranational body which has the right to issue and 327
give the same, and with national laws aimed at enforcing the same to which 328
the Owners are subject, and to obey the orders and directions of those who 329
are charged with their enforcement; 330
(d) to discharge at any other port any cargo or part thereof which may 331
render the Vessel liable to confiscation as a contraband carrier; 332
(e) to call at any other port to change the crew or any part thereof or other 333
persons on board the Vessel when there is reason to believe that they may 334
be subject to internment, imprisonment or other sanctions; 335
(f) where cargo has not been loaded or has been discharged by the 336
Owners under any provisions of this Clause, to load other cargo for the 337
Owners' own benefit and carry it to any other port or ports whatsoever, 338
whether backwards or forwards or in a contrary direction to the ordinary or 339
customary route. 340
(6) If in compliance with any of the provisions of sub-clauses (2) to (5) of this 341
Clause anything is done or not done, such shall not be deemed to be a 342
deviation, but shall be considered as due fulfilment of the Contract of 343
Carriage. 344

18. General Ice Clause 345
Port of loading 346
(a) In the event of the loading port being inaccessible by reason of ice when the 347
Vessel is ready to proceed from her last port or at any time during the voyage or 348
on the Vessel's arrival or in case frost sets in after the Vessel's arrival, the 349
Master for fear of being frozen in is at liberty to leave without cargo, and this 350
Charter Party shall be null and void. 351
(b) If during loading the Master, for fear of the Vessel being frozen in, deems it 352
advisable to leave, he has liberty to do so with what cargo he has on board and 353
to proceed to any other port or ports with option of completing cargo for the 354
Owners' benefit for any port or ports including port of discharge. Any part 355
cargo thus loaded under this Charter Party to be forwarded to destination at the 356
Vessel's expense but against payment of freight, provided that no extra 357
expenses be thereby caused to the Charterers, freight being paid on quantity 358
delivered (in proportion if lumpsum), all other conditions as per this Charter 359

Party. 360
(c) In case of more than one loading port, and if one or more of the ports are 361
closed by ice, the Master or the Owners to be at liberty either to load the part 362
cargo at the open port and fill up elsewhere for their own account as under 363
section (b) or to declare the Charter Party null and void unless the Charterers 364
agree to load full cargo at the open port. 365
Port of discharge 366
(a) Should ice prevent the Vessel from reaching port of discharge the 367
Charterers shall have the option of keeping the Vessel waiting until the re- 368
opening of navigation and paying demurrage or of ordering the Vessel to a safe 369
and immediately accessible port where she can safely discharge without risk of 370
detention by ice. Such orders to be given within 48 hours after the Master or the 371
Owners have given notice to the Charterers of the impossibility of reaching port 372
of destination. 373
(b) If during discharging the Master for fear of the Vessel being frozen in deems 374
it advisable to leave, he has liberty to do so with what cargo he has on board and 375
to proceed to the nearest accessible port where she can safely discharge. 376
(c) On delivery of the cargo at such port, all conditions of the Bill of Lading shall 377
apply and the Vessel shall receive the same freight as if she had discharged at 378
the original port of destination, except that if the distance of the substituted port 379
exceeds 100 nautical miles, the freight on the cargo delivered at the substituted 380
port to be increased in proportion. 381

19. Law and Arbitration 382
* (a) This Charter Party shall be governed by and construed in accordance with 383
English law and any dispute arising out of this Charter Party shall be referred to 384
arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or 385
any statutory modification or re-enactment thereof for the time being in force. 386
Unless the parties agree upon a sole arbitrator, one arbitrator shall be 387
appointed by each party and the arbitrators so appointed shall appoint a third 388
arbitrator, the decision of the three-man tribunal thus constituted or any two of 389
them, shall be final. On the receipt by one party of the nomination in writing of 390
the other party's arbitrator, that party shall appoint their own arbitrator within 391
fourteen days, failing which the decision of the single arbitrator appointed shall 392
be final. 393
For disputes where the total amount claimed by either party does not exceed 394
the amount stated in Box 25** the arbitration shall be conducted in accordance 395
with the Small Claims Procedure of the London Maritime Arbitrators 396
Association. 397
* (b) This Charter Party shall be governed by and construed in accordance with 398
Title 9 of the United States Code and the Maritime Law of the United States and 399
should any dispute arise out of this Charter Party, the matter in dispute shall be 400
referred to three persons at New York, one to be appointed by each of the 401
parties hereto, and the third by the two so chosen; their decision or that of any 402
two of them shall be final, and for purpose of enforcing any award, this 403
agreement may be made a rule of the Court. The proceedings shall be 404
conducted in accordance with the rules of the Society of Maritime Arbitrators, 405
Inc. 406
For disputes where the total amount claimed by either party does not exceed 407
the amount stated in Box 25** the arbitration shall be conducted in accordance 408
with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators, 409
Inc. 410
* (c) Any dispute arising out of this Charter Party shall be referred to arbitration at 411
the place indicated in Box 25, subject to the procedures applicable there. The 412
laws of the place indicated in Box 25 shall govern this Charter Party. 413
(d) If Box 25 in Part I is not filled in, sub-clause (a) of this Clause shall apply. 414
* (a), (b) and (c) are alternatives; indicate alternative agreed in Box 25. 415
** Where no figure is supplied in Box 25 in Part I, this provision only shall be void but 416
the other provisions of this Clause shall have full force and remain in effect. 417

WORKING COPY

This document is a computer generated GENCON 1994 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



**RIDER CLAUSES TO**
**= MV "JACO MERCHANT" =**
**CHARTER PARTY DATED 23 FEBRUARY 2007**

---

**CLAUSE 20**
MV "JACO MERCHANT"
Geared dry cargo open hatch singledecker
Built 1984 - NIS flag – Registered: Sarpsborg
10.700 Mts dwt on 8.28 m SSW,
About 10.300 mts cargo capacity
LOA 135,06 m / Beam 20,70 m,
Max height above keel 42,7 m,
GT 8.183 / NT 4.408,
Class GL 100 A5 E3 G,Imo no: 8324713
Type of engine: MAN 8 L 40/45, 6.600 BHP,
Speed / Consumption:
About 13,00 knots on about 19 mt IFO 380 (ISO 8217 1st rev. CD 1994 RMG 35)
Per 24 hours. In calm weather up to beaufort 3.
Idle in port:          about 1,5 mts MGO
All cranes working:    about 2,5 mts MGO
At sea no MGO, hence shaft generator
Bunker capacities:     732 mts IFO  / 186 mts MGO / 143 mts FW
                       4.930 mts ballast water

| Hatch dimension: | Length | Beam | | |
|---|---|---|---|---|
| No. 1 A: | 12,90 x 10,24 | | | |
| No. 1 B: | 12,60 x 10,24 | | | |
| No. 2 : | 37,80 x 16,00 | | | |
| No. 3 : | 25,20 x 16,00 | | | |

| Hold dimension: | Length | Beam | | Height | |
|---|---|---|---|---|---|
| No. 1 A: | | 12,90m x 5,0 front – 10,24 aft | | x  9,26 m | |
| No. 1 B: | | 12,60m x 10,24m | | | x 11,50 m |
| No. 2  : | | 37,80m x 16,00m | | x 11,50 m | |
| No. 3    : | | 25,20m x 16,00m front – 9,00 aft | | x 11,50 m | |
| | | Grain | Bale | | |
| Cargo hold 1A | 42.176 | | 41.293 | | |
| Cargo hold 1B | 53.982 | 52.795 | | | |
| Cargo hold 2 | 249.173 | | 246.235 | | |
| Cargo hold 3 | 162.748 | | 161.144 | | |
| Total | | 508.079 | 501.467 | | |

Hatches
No. 1 hatch cover is closed by means of hydraulically operated McGregor type end folding.
No. 2 hatch is closed with steel pontoons, which are piggy-bagged, respectively rolled fore and aft
by a hydraulically operated Jack-up and pulling steel chain system.
No. 3 hatch cover is closed by means of hydraulically operated McGregor type end folding.
The vessel has three cargo holds with No. 1 (No. 1A and No. 1B) being separated by thwart ship
bulkhead. There is access through the bulkhead but it can be closed by timber panels, which
allows different cargo in each part of the hold. The tank top of the forward compartment (1A) is
raised by approximately 2 meter above the tank top of (1B).
Holds are boxed and double skinned.
Geared:
Equipped with 3 hydraulic deck cranes, which located on the portside in one line at:
Crane 1.
Located in middle of hatch no. 1: SWL 25 mt with crane radius up to 26 m.
Crane 2.
Located in middle of hatch no. 2: SWL 35 mt with crane radius up to 18 m.
                                : SWL 25 mt with crane radius up to 26 m.
Crane 3.



### RIDER CLAUSES TO
### = MV "JACO MERCHANT" =
### CHARTER PARTY DATED 23 FEBRUARY 2007

Located in middle of hatch no. 3 : SWL 35 mt with crane radius up to 18 m.
                                  : SWL 25 mt with crane radius up to 26 m.
4 hydraulic operated automatic mooring winches.
CO2 fitted
Shaftgenerator
Timber intake about 14.000 m3
Ice class 1A Fin/Swe
All modern nautical and navigation equipment.
ALL DETAILS ABOUT AND GIVEN IN GOOD FAITH AS PER BUILDERS PLAN BUT WITHOUT
GUARANTEE.

**CLAUSE 21**
All taxes and / or dues calculated on cargo and / or freight not to be for owners account both
ends. All taxes and / or dues on vessel / flag / crew / freight to be for Owners account both ends.
Any extra insurance on cargo on account of vessel's age, to be for charterers account.

**CLAUSE 22**
LOADING / DISCHARGING
Load:          24hrs per weather working day Sundays and holidays included
Discharge:     1500 tons per weather working day 24 hours, Saturdays, Sundays and holidays
excluded, Saturday 12h00 to Monday 08h00 not to count unless used. If used, actual time used
to count. At discharging port time from 17:00 Friday or 17:00 the day before a holiday, until 08:00
Monday or the day after a holiday, not to count as laytime unless used.

**CLAUSE 23**
Owners' agents at load port:      Revelle

Charterers' agents at discharge port:      Samcham
                                           Toyin Omisore   samcham@hyperia.com
                                           +23 41 587 4002 (office)
                                           +23 48 02313 8133 (mobile)

**CLAUSE 24**
NOTICE OF READINESS
Vessel is giving load readiness 16 March 2007 weather permitting all going well. At both loading
and discharge port Owners to give first Notice of Readiness and then 10/5/4/3/2/1 days notice of
vessel's arrival. Notice of Readiness to be given to Brokers and Agents. Notice of Readiness can
be tendered whether in port or not, whether in berth or not, whether in free pratique or not,
whether customs cleared or not. Notice of Readiness to be tendered bss wwww even by
cable/vhf/tlx within normal working hours 0800 / 1700, Monday to Friday.

**CLAUSE 25**
Master or agent to sign Congen Bills of Lading

**CLAUSE 26**
Master to supply and give free use of sufficient lights to enable night work in all holds if required.

**CLAUSE 27**
Master to supervise all stowage of the cargo.
Loading with shore cranes and expenses for loading for charterers account. Discharging with
vessel's gears. Discharge to be carried out with vessel's gear.



RIDER CLAUSES TO
= MV "JACO MERCHANT" =
CHARTER PARTY DATED 23 FEBRUARY 2007

**CLAUSE 28**
Charterers / Shippers to assist as much as possible the vessel/master/crew to trim cargo while loading with the conveyor belt loader in order to allow vessel to load the max possible and reduce broken stowage. Owners confirm vessel's gear is capable of discharging into hopper height of which is 22' above the quayside.

**CLAUSE 29**
Any dispute arising out if this contract shall, unless the parties agree forthwith on a single Arbitrator, be referred to the final Arbitration in London of two Arbitrators who shall be commercial men carrying on business in London in the shipping trade and who shall be members of the L.M.A.A. One to be appointed by each of the parties with power to such Arbitrators to appoint an Umpire whose decision shall be final and binding upon both parties. English Law shall govern interpretation / execution of this contract. L.M.A.A. small claims procedure shall apply to disputes less than USD 25,000.

**CLAUSE 30**
In order for any claims arising from this Charter Party or Bill of Lading relating to this Charter Party to be considered by the Charterers, they must be submitted in writing together with full supporting documents within 12 months of completion of discharge of the vessel.

**CLAUSE 31**
Vessel to be fully P & I covered, including for cargo claims, which cover is to be maintained during the currency of this Charter Party.

**CLAUSE 32**
Freight to be paid 100% within 5 banking days after signing/releasing Bills of Lading. Bills to be marked 'freight payable as per charter party'.

**CLAUSE 33**
Cleans Bills of Lading provided no remarks on the cargo by the master.

**CLAUSE 34**
Demurrage to be settled / paid within 10 banking days after presentation of laytime calculation / nor / sof / time sheet all duly signed by shippers / receivers / agents, fax copies to be accepted.

**CLAUSE 35**
All negotiations and fixture to be strictly private and confidential.

**CLAUSE 36**
Amended Bimco U.S. security clause for voyage chartering.
If the vessel calls in the United States, including any U.S. territory, the following provisions shall apply with respect to any applicable security regulations or measures:
Reporting- the vessel or its agents shall report and send all notices as required to obtain entry and exit clearances from the relevant U.S. authorities. Any delay caused by the failure to so report shall be for the owners account, unless such failure to report is caused by or attributable to the charterers or their representatives or agents including but not limited to the shipper and / or receiver of the cargo.
Clearances- unless caused by the owners negligence or causes attributable to the vessel, any delay suffered or time lost in obtaining the entry and exit clearances from the relevant U.S. authorities shall count as laytime or time on demurrage.
Expenses- any expenses or additional fees relating specifically to the cargo, even if levied against the vessel, that arise out of security measures imposed at the loading and / or discharging port and / or any other port to which the Charterers order the vessel, shall be for the Charterers account.



RIDER CLAUSES TO
= MV "JACO MERCHANT" =
CHARTER PARTY DATED 23 FEBRUARY 2007

Notice of Readiness- notwithstanding anything to the contrary contained in this Charter Party, the vessel shall be entitled to tender notice of readiness whether cleared for entry or not by any relevant U.S. authority.

**CLAUSE 37**
Owners Bank Details:
TBA

Signed:

_____                    _____

**Owners**                                   **Charterers**

# multiport Voyage Estimation

MULTIPORT voyage estimation 16/01/2008 13:15

vessel  o/c Alphamate

| ld ports | cargo | lfrate | shex % | lddays | dlrate | shex % | dl/days | freight | lumsum | comm% | nt/freight |
|---|---|---|---|---|---|---|---|---|---|---|---|
| N.ORLEANS-/BYVA | 15000 | 8000 | 50% | 2.81 | 3500 | 50% | 6.43 | 87 | | 3.75% | |
| ALPHAMATE | | 1 | 0% | 0.00 | 1 | 0% | 0.00 | 0 | | 0.00% | |
| | | 1 | 0% | 0.00 | 1 | 0% | 0.00 | 0 | | 0.00% | |
| | | 1 | 0% | 0.00 | 1 | 0% | 0.00 | 0 | | 0.00% | |
| | | 1 | 0% | 0.00 | 1 | 0% | 0.00 | 0 | | 0.00% | |
| | | 1 | 0% | 0.00 | 1 | 0% | 0.00 | 0 | | 0.00% | |
| | | 1 | 0% | 0.00 | 1 | 0% | 0.00 | 0 | | 0.00% | |

ttl cargo 15000

avr/freight$

| | | | | ttl days load 2.81 | | ttl days disch 6.43 | | | ttl frt $ net |
|---|---|---|---|---|---|---|---|---|---|

speed/ballast 10.5    sea/ds/ballast
speed/loaded 10.5    sea/ds/loaded
distance ballast 432    ttl sea days
distance laden 5691    ttl port days   2.81

xport days 1    TOTAL voyage days
xsea days ballast 0
xsea/lor/loaded 0
xdays to/loaded 1

days load /ports

| days load /ports | days disch ports |
|---|---|
| 95000 | 35000 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |

ttl disbursmts/ld $ 95000    35000

| daily | consumption | ttl tons |
|---|---|---|
| t/o sea | 12.0 | 292 |
| t/o port | 0.0 | 0 |
| du sea | 1.5 | 36.4 |
| du port | 3.0 | 30.7 |

bunker prices
t/o price 568.0
du price 950.0

despatch /days 0    comm. %    rate
demurrage 0    0    0
    0    0%

voyage total net profit $

tc equivalent $ net    net d/y profit
tc opex $ 23100    voyage total net profit $

| | expenses$ | | additional credits |
|---|---|---|---|
| t/o sea | | | demurrage 0 |
| t/o port | 130000 | 194735 | |
| du sea | | 0 | |
| du port | 35718 | | balast/bonus 0 |
| | 30109 | | |
| despatch | | total | 0 |
| xts/canals | | | |
| daily expns | 561500 | | |
| loan+interest | 0 | | |
| various expns | 7000 | | |
| | 0 | | |
| total expns. | 925064 | total income | 1250062.5 |
| net revenue | 326999 | | |

reqrd nt t/c $    1 to 1 port    multiport
27000

freight incrd $    net of com.
net of com.    40.31    24.11

MULTIPORT voyage estimation 16/01/2008 12:56



# multiport Voyage Estimation

**vessel** Sider Unity Acc Tricoal c/p d/d 04/12/07 Houston-Lagos

# EMPROS LINES SHIPPING COMPANY Sp. S.A.

(INCORPORATED IN MONROVIA)
BRANCH IN GREECE

EMPROS LINES BUILDING

*2. Parnassou St. & Kifissias Ave.*

*151 24 Amaroussion*

Telephone: +30 (1) 8125500
Fax:  +30 (1) 8125580
Telex:  214706-9
e-mail:  empros@emproslines.com



## ORIGINAL

Your Ref:

Our Ref:

09th of January, 2008

MESSRS,
**"TRICOAL (Pty) Ltd"**,
Johannesburg

## DEMURRAGE INVOICE

## M/V SIDER UNITY– ACCT/ TRICOAL – CP DD 04.12.07
## Port Arthur / Lagos – Cargo : Petcoke

--------------------------------------------------------------------------------
*Demurrage L/P (Port Arthur)*                                    Usd 140,868.75
**Less**
3.75% commission ex-demurrage              Usd 5,282.58
--------------------------------------------------------------------------------
**Demurrage due to Owners**                                 **Usd 135,586.17**

### PAYABLE TO :

Correspondent Bank: **WACHOVIA BANK NA, NEW YORK**
Account: **THE ROYAL BANK OF SCOTLAND INTERNATIONAL LIMITED**
Account Number: **2000193009149 (CHIPS 155424)**
Swift: **PNBPUS3NNYC**

Beneficiary Bank Details: For further credit to
Bank Name: **ROYAL BANK OF SCOTLAND INTERNATIONAL**
Address: **71 Bath Street, St Helier, Jersey**
SORT CODE: **16-10-28**     BIC CODE: **RBOSJESX**
Account Name: **EMPROS LINES SHIPPING COMPANY SP. S.A.**
Account Number: **GB89RBOS16102850384719**
Ref : m/v Sider Unity - Acc/ Tricoal – c/p dd 04.12.07 – DEMURRAGE INVOICE

Regards,

../..

**EXHIBIT**

tabbies   C